ROBINSON *v.* STATE.

No. 39585        February 28, 1955        78 So. 2d 134

*W. M. Broome,* Crystal Springs, for appellant.

*Wm. E. Cresswell,* Asst. Atty. Gen., Jackson, for appellee.

Kyle, J.

The appellant, Homer Robinson, was indicted for murder in the killing of George Taylor, who is referred to in the record as "Steve" Taylor, at the July 1954 term of the Circuit Court of Copiah County, and was tried and convicted of manslaughter and sentenced to imprisonment in the state penitentiary, and from that judgment he prosecutes this appeal.

The killing occurred on April 2, 1954, about 4 o'clock a. m., in the appellant's home about three miles northwest of the Town of Crystal Springs. There was an audiphone or juke box in the room where the killing occurred, and a table and several chairs. The testimony indicates that several people had congregated in the house during the night and some of them had been drinking heavily. There had also been some gambling.

Eddie Powell, who was in the room at the time of the killing, testified as the first witness for the State. He stated that there had been "a bunch of us" there during the night. Some of the boys had been gambling, playing "Skin." At the time of the shooting Eddie was sitting in a chair in the room and was asleep. He was awakened by a gunshot, and saw the deceased falling to the floor. The appellant had a pump gun in his hand. After the gun was fired and the deceased had fallen to the floor, the appellant called to him and said, "Wake up, Steve"; and the appellant then pulled the dying man into an adjoining room and told his wife, who was asleep at the

time of the shooting, that he had shot Steve. The appellant later pulled the body back into the room where the shooting had occurred, and the appellant's wife, Elnora, told the appellant to "call the law." Eddie stated that he looked around for his hat and could not find it, and that he left bareheaded to go to the home of Steve's mother to tell her what had happened. When Eddie returned about an hour later, the officers had arrived for the purpose of investigating the shooting. After that the undertakers came and Eddie helped them put the body in a basket; and when the body was moved, Eddie found his hat and a knife lying under Steve's right arm. He did not know whose knife it was, but the knife was closed when he found it. He gave the knife to Louise Taylor and left word with her to give the knife to the constable.

Jesse Cooper, who is referred to in the record as "Fantoe," testified that he was at the appellant's house during the night and at the time of the killing, but that he was drunk and asleep and knew nothing about the killing. He stated that he did not hear the gun when it was fired, but the appellant and his wife awakened him sometime later. He stated that he owned a knife and kept it in his left pocket, but he did not have the knife when he left the appellant's house the next morning, and did not see the knife again until the constable showed it to him a day or two later.

Plez Burney, constable and deputy sheriff, and Boyce Ferguson, the city marshal of Crystal Springs, were notified of the killing and went to the house about an hour after the killing had occurred for the purpose of making an investigation.

Burney testified that the appellant and Lewis Brewer were standing on the porch when he arrived. Burney found the dead man lying on the floor just inside the door. He asked the appellant who killed the deceased, and the appellant said that he did. Burney then asked

him what with, and the appellant said, "This shotgun over here * * *. We were playing with the gun. I didn't mean to kill him—we were playing with it." The appellant told the officers that he did not know the gun was loaded, that he "jugged" it against Steve's chest and pulled the trigger and the shell was in there and it fired. The appellant admitted that he had carried the body into the other room and had then brought it back into the room where the killing occurred before the officers arrived. Burney stated that he examined the body and found a bullet hole in the chest to the right of the heart. He searched the pockets of the deceased and found no weapon of any kind, and he found no weapon on the floor or near the body. That was about one hour or one hour and a half before the undertakers arrived. Burney identified the shotgun that he found in the house, which was a .28-gauge pump shotgun, and a knife that had been turned over to him by Louise Taylor the day after the killing, and Burney stated that Jesse Cooper told him later that the knife was his. Burney stated that the hat and knife referred to by Eddie Powell and other witnesses were not under the arm or shoulder of the deceased at the time he examined the body, and Burney stated that the appellant said nothing to him about having had an argument with the deceased, or about having to defend himself in the encounter with the deceased at the time of the killing.

Boyce Ferguson, who was present at the time Burney questioned the appellant, also testified that the appellant made no statement with reference to the deceased advancing on him with a knife, or with reference to his having to shoot the deceased in self-defense.

The appellant, testifying as a witness in his own behalf, stated that he and Steve were laughing and talking before the trouble started. They got into an argument, and then both started to cursing. The appellant told Steve that he would have to get out. Steve said to the

appellant, "If you are bad, put me out." Isaiah Wilson, who was in the room at the time, got between them, and told them to sit down. The appellant sat down, and then looked up and saw Steve coming toward him with a knife, and Steve told him that he would "pull his head off." The appellant walked into the bedroom and got the shotgun from under the mattress and came back. The appellant told Steve to get out. Steve looked up at him and told him, "I will pull your head off," and made a long step toward the appellant. Appellant told him to get back. Steve then made a short step, and then "lent" toward the appellant, "and that is when I shot." The appellant was asked by his own attorney why he shot Steve and his answer was, "Because he was coming on me with a knife." On cross-examination the appellant admitted that Steve never did cut at him with a knife. He was asked the direct question, "But, you can't say he made one pass at you with that knife?" And his answer was, "No, sir, because I didn't let him get close enough to me."

Elnora Robinson, the appellant's wife, testified that when she came into the room after the shooting, Eddie Powell picked up a knife and showed it to her, and then fastened it up and put it in his pocket. Eddie, being later recalled as a witness in rebuttal, testified that Elnora's statement about the knife was untrue.

The appellant's version of the killing was corroborated in its main aspects by the testimony of Isaiah (Skeeter) Edwards, who testified that he was in the room at the time of the killing. But on cross-examination Isaiah stated that Steve never did cut at the appellant—"No, sir, he just told him he would pull his head off."

The appellant's attorney argues two points as grounds for reversal on this appeal: (1) That the court erred in granting certain instructions to the State, and (2) that the verdict returned is contrary to the overwhelming weight of the evidence.

It is first argued that the court erred in granting the following instruction to the State:

"The court instructs the jury for the State that manslaughter is the killing of a human being without malice, in the heat of passion, without authority of law, and not in necessary self-defense; and if the jury believe from the evidence in this case beyond a reasonable doubt that the defendant Homer Robinson so killed George Taylor, then you will find the defendant guilty of manslaughter and your verdict may be: We, the jury, find the defendant guilty of manslaughter."

It is contended that the instruction is erroneous because of the omission of the words, "by the use of a dangerous weapon," which are contained in the statutory definition of the crime of manslaughter as defined in Section 2226, Code of 1942.

But we think that the omission of the words "by the use of a dangerous weapon," in the above mentioned instruction, was harmless under the facts in this case for the reason that all of the witnesses, including the appellant, testified that the weapon used to effect the death of the deceased was a .28-gauge pump shotgun.

It is next contended that the court erred in granting to the State two instructions defining the crime of manslaughter by culpable negligence. The first of the two instructions authorized the conviction of the appellant of manslaughter if the jury believed from the evidence that the appellant feloniously pointed and aimed a loaded gun at and toward the deceased and discharged the same by an act of culpable negligence which resulted in the death of the deceased. The language used in the instruction was practically the same as the language used in the instruction approved by this Court in the case of Robertson v. State, 153 Miss. 770, 121 So. 492. The second of the two instructions defined more accurately the degree of negligence that the State was re-

quired to prove to make out a charge of culpable negligence.

It is contended that the court erred in granting the two instructions for the reasons: (1) That there was no substantial evidence in the record to show that the appellant pointed and aimed the loaded gun at and toward the deceased, and discharged the same by an act of culpable negligence; (2) that there was no evidence in the record to show that the appellant was guilty of any act of negligence that evinced a wanton, reckless and willful disregard for human life, or a conscious and wanton disregard of the possibilities of the fatal consequence to another as a direct result of the willful creation of an unreasonable risk; and (3) that the giving of the two instructions, along with the instruction on voluntary manslaughter, had the effect of confusing the jury as to the issues that they were to decide and deprived the appellant of his right to a fair and impartial trial.

But we think there was no error in the granting of the two instructions.

The two instructions presented the State's theory of the case based upon the appellant's own account of the killing given to the officers during their investigation of the killing about one hour after the fatal shot was fired. The officers testified that the appellant's statement was made freely and voluntarily; and that statement was, in effect, that the appellant and the deceased were playing with the gun, that the appellant did not know that the gun was loaded, and that he "jugged" it against the chest of the deceased and pulled the trigger, and the shell was in there and it fired. Neither the appellant nor his wife said anything to the officers at that time about the deceased having a knife or about the appellant shooting in defense of his own life. It is true that the appellant claimed during the trial that the deceased had a knife in his hand and that he shot the appellant to protect himself from great bodily harm; but even then, while

the appellant was on the witness stand, the appellant stated on cross-examination that, when he got the gun and looked back, the deceased was coming in the door on him, and he "jugged" him. And the appellant's witness, Isaiah Edwards, testified that the appellant raised the gun to his breast, and the deceased said, "You ain't got guts enough to pull the trigger," and "when he did that Steve 'lent' and Homer 'jugged' him and the gun fired."

██ █ Whether the appellant killed the deceased involuntarily by his culpable negligence, without authority of law, or whether he killed the deceased voluntarily, in the heat of passion, without authority of law, and not in necessary self-defense, or whether he killed the deceased in defense of his own life or to protect himself from imminent danger of great bodily harm, was a question for the jury to decide; and there was no error in the action of the trial judge in granting the instructions complained of.

██ █ The remaining point argued by the appellant's attorney as ground for reversal of the judgment of the lower court is that the verdict of the jury was contrary to the overwhelming weight of the evidence. But we think that there was sufficient evidence to support the verdict of the jury. If the jury believed that the appellant stated the true facts to the officers when they made their investigation of the homicide a short time after it occurred, the jury was amply justified in convicting the appellant of involuntary manslaughter by culpable negligence. If, on the other hand, the jury believed that the killing was done in the heat of passion, without authority of law, and not necessary self-defense, it was their duty to convict the appellant of voluntary manslaughter.

We find no reversible error in the record, and the judgment of the lower court is affirmed.

Affirmed.

*McGehee, C. J.,* and *Hall, Holmes* and *Gillespie, JJ.,* concur.